IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BENNU OIL & GAS, LLC, *et. al,*[1] | § | CASE NO. 16-35930 |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |
| | § | |

**TRUSTEE'S EMERGENCY MOTION SEEKING THE ENTRY OF AN ORDER: (I) APPROVING AUCTION AND BIDDING PROCEDURES, BREAKUP FEE, AND PROCEDURES FOR THE ASSUMPTION AND ASGINMENT OF EXECUTORY CONTRACTS; (II) APPROVING NOTICE PROCEDURES FOR THE SOLICITATION OF BIDS AND AN AUCTION; (III) SCHEDULING A HEARING ON APPROVAL OF THE SALE OF THE DEBTOR'S CLIPPER ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, CHARGES, AND ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (IV) GRANTING RELATED RELIEF**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE**

---

[1] The Debtors in these jointly administered chapter 7 cases are Bennu Oil & Gas, LLC (Case No. 16-35930), Bennu Blocker, Inc. (Case No. 16-35931), and Bennu Holdings, LLC (Case No. 16-35932).

**EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**THE MOVANT REQUESTS CONSIDERATION OF THE MOTION AS SOON AS THE COURT'S CALENDAR WILL ALLOW AND IN ANY EVENT NO LATER THAN JULY 14, 2017.**

TO:    THE HONORABLE DAVID R. JONES,
        UNITED STATES CHIEF BANKRUPTCY JUDGE

Janet S. Northrup, the chapter 7 trustee (the "**Trustee**"), for the above-referenced and jointly administered bankruptcy cases hereby files her *Emergency Motion Seeking the Entry of an Order: (i) Approving Auction and Bidding Procedures, Breakup Fee, and Procedures for the Assumption and Assignment of Executory Contracts; (ii) Approving Notice Procedures for the Solicitation of Bids and an Auction; (iii) Scheduling a Hearing on Approval of the Sale of the Debtor's Clipper Assets Free and Clear of All Liens, Claims, Charges, and Encumbrances and the Assumption and Assignment of Executory Contracts; and (iv) Granting Related Relief* (the "**Motion**").  In support of the Motion, the Trustee would respectfully submit as follows:

## I.   JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.      The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the requested relief are sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 - 1532 (as amended, the "**Bankruptcy Code**"),  rules 2002, 6004, 6006, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (individually, a "**Rule**" or collectively, the "**Rules**").

## II.   CORE PROCEEDING

2.      This is a core proceeding under 28 USC § 157(b)(2)(A), (B), (M), (N) and (O). Since this is a core proceeding, the Bankruptcy Court has constitutional authority to enter final

3009126_7

orders regarding the Motion.  Moreover, the Trustee consents to the entry of final orders by the Bankruptcy Court.  Further, to the extent that the Bankruptcy Court determines that it does not have authority to enter a final order on a portion of or all of the Motion, the Trustee requests that the Bankruptcy Court issue a report and recommendation for a final order to the United States District Court for the Southern District of Texas, Houston Division.

### III.  BACKGROUND

**A.  PROCEDURAL BACKGROUND**

3.      On November 30, 2016 (the "**Petition Date**"), Bennu Oil & Gas, LLC ("**Bennu** or the "**Debtor**") and each of the affiliated debtors (collectively, the "**Debtors**") filed voluntary petitions for relief pursuant to chapter 7 of the Bankruptcy Code, thereby initiating the above-styled and subsequently jointly administered bankruptcy cases (the "**Case**").

4.      Also on November 30, 2016, the Trustee was appointed to serve as the chapter 7 trustee in the Case.

5.      On January 26, 2017, the Trustee conducted the Debtors' statutory 341 creditors meeting.

6.      On February 8, 2017, Trustee filed the *Trustee's Motion for Order Directing Joint Administration of Cases,* thereby requesting that the Debtors' bankruptcy cases be consolidated for administration purposes only (the "**Joint Admin Motion**").  [Docket No. 53].

7.      On March 30, 2017, an order granting the Joint Administration Motion was entered.  [Docket No. 87].

8.      On May 9, 2017, the Trustee filed her *Emergency Motion Seeking Entry of Stipulation and Agreed Order (i) Authorizing the Use of Cash Collateral, (ii) Granting Adequate Protection to the Prepetition Secured Parties, (iii) Modifying the Automatic Stay, and (iv)*

*Granting Related Relief* (the "**Cash Collateral Motion**").  [Docket No. 97].  Through the Cash Collateral Motion, the Trustee requested, among other things, authority to utilize the cash collateral of the Debtors' prepetition lenders (the "**Prepetition Lenders**").

9.     On May 15, 2017, the Trustee filed her *Emergency Motion for Approval of (i) Post-Petition Insurance Premium Financing and (ii) the Payment of Post-Petition Insurance Premium Financing Payments* (the "**Insurance Motion**").  [Docket No. 110].

10.    On May 18, 2017, the Bankruptcy Court entered its order approving the Cash Collateral Motion (the "**Cash Collateral Order**") and order approving the Insurance Motion. [Docket Nos. 126 and 125].

**B.  FACTUAL BACKGROUND**

   *i.  Bennu's acquisition of ATP assets*

11.    Bennu was originally formed in order to acquire certain assets from ATP Oil & Gas Corporation's ("**ATP**") chapter 11 bankruptcy estate, pursuant to section 363 of the Bankruptcy Code.  At that time, ATP was a chapter 11 debtor-in-possession in a chapter 11 case pending before the Honorable Marvin Isgur (the case was subsequently converted to a case under chapter 7 of the Bankruptcy Code).  The sale of ATP's assets to Bennu closed November 1, 2013 (the "**ATP Sale**").

12.    Pursuant to the ATP Sale, Bennu acquired, among other things, certain oil and gas leases and wells located on the Outer Continental Shelf in the Gulf of Mexico.  The assets acquired by Bennu pursuant to the ATP Sale included the oil and gas leases covering and wells located on the Green Canyon field (GC 300) (the "**GC 300 Lease**" or "**Clipper Lease**").  Bennu also acquired ATP's interests in various easements, production facilities, pipelines, machinery and production equipment appurtenant to or used in connection with the operations of the wells located on the Clipper Lease (collectively, the "**Clipper Facilities**" and together with the Clipper

Lease, the "**Clipper Assets**").  Bennu acquired the Clipper Assets subject to certain liabilities incurred by ATP, including obligations to plug and abandon all wells and dismantle and decommission various fixtures and production-related equipment on or associated with the Clipper Lease (collectively, the "**P&A Liabilities**").  A review of the Debtor's records reveals that the Debtor estimated the P&A Liabilities to be approximately $28,000,000 for the GC 300 Lease, as of March 2016.  Moreover, the United States Department of Interior, Bureau of Safety & Environmental Enforcement ("**BSEE**") has filed a proof of claim asserting $41,118,000.00 in P&A Liabilities associated with the GC 300 Lease.  *See* Claims Register for Bennu at Claim No. 56.

13.     ATP did not own the platform from which production of the Clipper Assets was handled.  Instead, ATP was a party to that certain *Production Handling and Operating Services Agreement* (the "**PHA**") with Murphy Exploration & Production Company – USA ("**Murphy**"), whereby Murphy processed and handled the transportation and sale of the hydrocarbons produced from the Clipper Assets.  As of the Petition Date, the PHA was an active agreement and to date, the Trustee has neither rejected nor assumed the PHA.

## IV.  THE SALE PROCESS

14.     Through this Motion, as described above and pursuant to the terms of Murphy's offer to purchase the Clipper Assets, the Trustee seeks authority to market and sell the Clipper Assets[2], which are more specifically defined and described in the Form Asset Purchase Agreement attached hereto as **Exhibit "A"** (the "**Form Purchase Agreement**").  Under the circumstances, the Trustee believes that the procedures proposed herein with respect to the sale

---

[2]  The Trustee reserves the right to amend and/or supplement the scope of the Clipper Assets to be included in a sale based in part upon the bids received.

of the Clipper Assets (the "**Sale**") is the best way to maximize the value of these assets for the benefit of the Debtor's bankruptcy estate (the "**Estate**"), creditors, and stakeholders.

## A.  THE MARKETING PROCESS TO DATE

15.     Subsequent to her appointment, the Trustee and her counsel held a meeting with the Debtors' former management to discuss the Debtors' business operations, assets, liabilities, and the events precipitating the filing of the Case.  Among the topics discussed with the Debtors' former management were efforts to market the Debtors' assets prior to the Petition Date.  As a result of those discussions, the Trustee learned that the potential pool of prospective purchasers for the Debtors' oil and gas leases (collectively, the "**Offshore Assets**") was somewhat limited due to various concerns, including, but not limited to, the location of the leases relative to the available platforms and/or pipelines necessary to get production to market and the P&A liabilities associated with the leases.

16.     Due to such concerns, it was the opinion of the Debtors' former management that the only parties that would have a genuine interest in acquiring the Offshore Assets were those parties that were already either (i) in the chain of title on the leases and therefor potentially liable for P&A Liabilities in the event that Bennu could not pay them or (ii) were already operating wells in close proximity to the Offshore Assets and would therefore likely have the ability to connect the Debtors' wells and/or future wells to their existing infrastructure in an economically feasible manner.

17.     Prior to the Petition Date, the Debtors' former management engaged in talks with multiple parties regarding a potential sale or sales of the Offshore Assets.  However, no agreements were reached with respect to a sale of any of the Offshore Assets, including the Clipper Assets.

6

3009126_7

18.     The Debtors' former management provided the Trustee with a list of potential purchasers for the Offshore Assets.  With the assistance of counsel, the Trustee approached those potential purchasers to gauge their interest in purchasing the Clipper Assets.  In addition, the Trustee was approached by other parties expressing an interest in purchasing certain of the Offshore Assets.  Five (5) parties[3] entered into confidentiality agreements with the Trustee to facilitate their ability to conduct due diligence prior to submitting offers on the Offshore Assets.  In order to facilitate an efficient method to distribute the large volume of data necessary for parties to conduct due diligence, the Trustee established a data room and negotiated with counsel for the companies from which the Debtors' obtained their seismic data to allow controlled access to the seismic data related to the Offshore Assets.

19.     As a result of these efforts, the Trustee has received an offer from Murphy to purchase the Clipper Assets.  Moreover, Murphy has (i) agreed that its offer shall be considered a stalking horse bid (the "**Stalking Horse Bid**") for the Clipper Assets in accordance with the procedures set forth herein; (ii) has already or will be entering into an asset purchase agreement for the Clipper Assets (the "**Stalking Horse Agreement**"); and (iii) has consented to the use of the Stalking Horse Agreement as the Form Purchase Agreement to be utilized by other potential bidders for the Clipper Assets.

20.     Based on the preparations and diligence completed to date, the Trustee in consultation with the Debtors' former management and her professionals, has concluded that: (a) a prompt and open sale of the Clipper Assets in which all interested buyers are encouraged to participate is the best way to maximize value for the Estate under the circumstances and (b) the

---

[3]  Murphy was not among the parties that entered into a confidentiality agreement with the Trustee.  Thus, Murphy was not granted access to the data room.

proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for the Clipper Assets.

## B. THE FORM PURCHASE AGREEMENT

21.     The Trustee has determined that distributing the Form Purchase Agreement to interested parties provides the best available platform for conducting an auction with respect to the Clipper Assets.  The Form Purchase Agreement contemplates the participation of a Stalking Horse Bidder for the Clipper Assets and the procedures discussed more fully below contemplate that interested purchasers will submit executed purchase agreements reflecting any changes from the Form Purchase Agreement.

## C. THE BIDDING PROCEDURES

22.     The Trustee proposes to conduct the Sale of the Clipper Assets through the sale and bidding process described below (the "**Proposed Sale Process**") to ensure that the Estate realizes the maximum value for the Clipper Assets.  To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Trustee has developed and proposed bid procedures to govern the Sale (the "**Bidding Procedures**"), which are attached as **Exhibit 1** to the Bidding Procedures Order that is attached hereto as **Exhibit "B"** (the "**Bidding Procedures Order**").  The Bidding Procedures are designed to encourage all entities to submit their best bids and to maximize the value of the Clipper Assets.

23.     The Trustee requests that this Court approve the Proposed Sale Process and the Bidding Procedures, the material terms of which are as follows:[4]

---

[4]   This summary is qualified in its entirety by the Bidding Procedures.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed to such term in the Bidding Procedures.  To the extent there are any conflicts or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

*Provisions Governing Qualifications of Bidders and Bids*

- <u>Initial Indication of Interest</u>  Any third party interested in submitting any proposal, solicitation, or offer for the Clipper Assets (a "**Potential Bidder**") is invited to submit a non-binding initial indication of interest (an "**Initial Indication**") to the Trustee's counsel on or before **July 21, 2017 at 12:00 p.m. (CST)**.  The Trustee will promptly, but in any event within one (1) day upon receipt, share all Initial Indications that are received with counsel to the Prepetition Agent.  *Bona fide* Potential Bidders who provide an Initial Indication which contains (1) a preliminary indication of the Clipper Assets that the Potential Bidder intends to bid on and the potential bid amount for the (a) Clipper Lease and (b) Clipper Facilities (with such potential bid amount allocated on an asset category basis) and (2) evidence demonstrating financial and operational capability to consummate a transaction.  The failure to submit an Initial Indication shall not preclude a Potential Bidder from submitting a Qualified Bid pursuant to the procedures outlined below.

- <u>Qualified Bids</u>.  In order to constitute a Qualified Bid (as defined below), any proposal, solicitation, or offer for the Clipper Assets (each, a "**Bid**") submitted by a bidder (each, a "**Bidder**"), whether such Bidder has provided an Initial Indication or not, must (i) be submitted in writing prior to **July 28 2017 at 12:00 p.m. (CST)** (the "**Bid Deadline**") and (ii) satisfy the following requirements, as determined by the Trustee in her reasonable business judgment and in consultation with counsel to the Prepetition Agent (collectively, the "**Bid Requirements**"):

  a) Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Form Purchase Agreement) (a "**Qualified APA**") and shall: (i) identify the Clipper Assets the Bidder seeks to purchase, (ii) contain the form of and total consideration to be paid by such Bidder, including the liabilities to be assumed, with such consideration allocated as to the Clipper Lease (with respect to hydrocarbon reserves) and on an asset by asset basis (with respect to any other asset(s)), (iii) provide for the assumption of applicable decommissioning obligations set forth in The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* ("**OCSLA**") and its implementing regulations set forth in 30 C.F.R. Part 250, Subpart Q and related financial assurance requirements set forth in 30 C.F.R. Part 556 (the "**Assumed P&A Obligations**"), and an indemnity for the Estate with respect to the Assumed P&A Obligations, associated with the Clipper Assets, (iv) with respect to Clipper Assets covered by a Stalking Horse Bid, provide for cash consideration in an amount sufficient to pay all Breakup Fee amounts related to such Stalking Horse Bid, except as described below with respect to a credit bid by any Prepetition Secured Party, and (v) not be subject to any (a)

9

financing contingency, (b) contingency relating to due diligence after the commencement of the Auction, (c) contingency relating to the approval of the Bidder's board of directors or other internal approvals or non-governmental third-party consents or approvals, or (d) any conditions precedent to the Bidder's obligation to purchase the Clipper Assets other than those included in the Form Purchase Agreement.

b)    Be accompanied by the provision of a certified or bank check or wire transfer that is an amount that is the greater of (1) $125,000.00 or (2) at least ten percent (10%) of the aggregate consideration proposed in the Qualified APA (including both cash and assumption of any liabilities) as a good faith deposit (the "**Good Faith Deposit**").  The Good Faith Deposit shall be held in escrow by the Trustee's law firm, Hughes Watters Askanase, LLP, and credited to the closing payment if the Bidder is ultimately determined to be the Successful Bidder (as defined below), if any closing payment is due, or to be returned to the Bidder in whole or in part as applicable if the Bidder is not the Successful Bidder or the Backup Successful Bidder.  In the event that a Bidder is selected as the Backup Successful Bidder, the Good Faith Deposit shall be returned to the Backup Successful Bidder within three (3) business days following the closing of a Sale to the Successful Bidder therefor.  No Prepetition Secured Party shall be required to make a Good Faith Deposit; however, any Prepetition Secured Party as Successful Bidder shall satisfy the Stalking Horse Bidder's Breakup Fee even if its Successful Bid is a credit bid.

c)    Contain a written statement that the Bidder agrees to be bound by the terms of the Bidding Procedures and the Bidding Procedures Order and include a commitment that the Bidder shall (i) commence and complete all filings with respect to necessary government and other approvals within four (4) days following the entry of the Proposed Sale Order (as defined below) with respect to the relevant Clipper Assets and (ii) consummate the purchase of the relevant Clipper Assets **no later than August 15, 2017.**

d)    Identify, with particularity, each and every executory contract and unexpired lease it intends to assume; *provided*, *however*, that such list of contracts may be later modified to the extent permitted under the Qualified APA.

(e)    Be accompanied by evidence satisfactory to the Trustee (in consultation with counsel to the Prepetition Agent) that the Bidder is willing, authorized (including by such Bidder's board of directors or comparable governing body), capable, and qualified financially, operationally, legally, and otherwise, of unconditionally performing

10

all obligations under the Qualified APA, including, without limitation, (i) all Assumed P&A Obligations with respect to the relevant Clipper Assets and (ii) the ability to provide adequate assurance of future performance under contracts and leases to be assumed pursuant to section 365 of the Bankruptcy Code.

f)   Provide (i) that the Bidder agrees to serve as the Backup Successful Bidder (as defined below) if it is selected as the next highest and best bid for any particular Clipper Assets after the Successful Bid is determined in accordance with the Bidding Procedures and (ii) that the Bidder's Bid shall remain open and irrevocable until at least forty-five (45) days after the entry of an order by the Court approving a definitive agreement providing for the Sale of those Clipper Assets.

g)   Fully disclose the identity of each entity that will be bidding in the Auction.

h)   Be submitted to (i) counsel for the Trustee: Hughes Watters Askanase LLP, Total Plaza, 1201 Louisiana Street, 28th Floor, Houston, Texas 77002, Attn: Timothy A. Million (tmillion@hwa.com) and Randall A. Rios (rrios@hwa.com) and (ii) counsel for the Prepetition Agent: O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, New York 10036, Attn: Michael F. Lotito (mlotito@omm.com) so as to be received not later than the Bid Deadline, **July 28, 2017 at 12:00 p.m. (CST)**.  The Trustee (in consultation with counsel to the Prepetition Agent) may extend the Bid Deadline until the start of the Auction for one or more bidders without further notice, but shall not be obligated to do so.

•   Credit Bidding.  At the Auction, any Prepetition Secured Party shall be entitled to (a) credit bid all or a portion of such the Prepetition Secured Party's claims in accordance with section 363(k) of the Bankruptcy Code and (b) reduce or reallocate the amount of the credit bid with respect to any particular Clipper Asset or group of Clipper Assets if the Prepetition Secured Party is not the successful Bidder with respect to such assets.

•   Credit Bids and Stalking Horse Bids as Qualified Bidders. Notwithstanding anything herein to the contrary, but subject to each Qualified Bidder's assumption of, and succession to, all applicable decommissioning obligations set forth in OCSLA and its implementing regulations found in 30 C.F.R. Part 250, Subpart Q, all applicable financial assurance requirements set for in 30 C.F.R. Part 556 and any other applicable regulatory obligations applicable to an owner or operator of federal leases, rights-of-way, or rights-of-use-and-easement that is proposed to be assumed and assigned, or otherwise transferred, to such

11

Qualified Bidder: (i) a Stalking Horse Bidder shall be deemed a Qualified Bidder and a Stalking Horse Agreement shall be deemed to be a Qualified Bid; and (ii) any Prepetition Secured Party shall be deemed to be a Qualified Bidder with respect to any "credit bid" pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid shall be deemed a Qualified Bid.

• **Notice of Qualified Bidders**.  A Bid that satisfies each of the Bid Requirements, as determined in the Trustee's reasonable business judgment, shall constitute a "**Qualified Bid**," and such Bidder shall be a "**Qualified Bidder**."  The Trustee shall notify each Qualified Bidder that such party is a Qualified Bidder within three (3) days after the Bid Deadline and will promptly thereafter file a notice of qualified bidders on the Case docket.

• **Evaluation of Competing Bids**.  The Bidding Procedures set forth various factors that will be considered by the Trustee in evaluating each Qualified Bid.  With respect to any particular Clipper Asset(s) that Murphy excludes from the Stalking Horse Agreement, the Trustee, in consultation with counsel to the Prepetition Agent (acting at the direction of the Required Lenders), may evaluate competing bids in a manner that will maximize the aggregate value to the Estate rather than maximize value from any individual portion of the Clipper Assets.

• **No Qualified Bids**.  If the Trustee does not receive any Qualified Bids, other than those of the Stalking Horse Bidder(s), with respect to any or all of the Clipper Assets, (i) the Auction shall be cancelled and the Trustee shall report the same to the Court and (ii) the Trustee shall promptly proceed to seek entry of the appropriate orders approving the Stalking Horse Agreement(s).

• **Selection of additional Stalking Horse Bidder(s)**.  The Trustee, with the consent (not to be unreasonably withheld) of the Prepetition Agent (acting at the direction of the Required Lenders), may select one or more additional Qualified Bidder(s) as additional stalking horse Bidder(s) at any time prior to the Bid Deadline by executing an agreement with such Qualified Bidder(s) in substantially the same form as the Stalking Horse Agreement.  If the Trustee so selects additional stalking horse bidder(s), she will file and distribute to all known Potential Bidders and Bidders a copy of the stalking horse agreements at least one (1) day prior to the Bid Deadline.  Any Bids received at the Auction must contain a signed definitive asset purchase agreement, together with a copy marked to show changes from the applicable Stalking Horse Agreement and/or the Form Purchase Agreement.

3009126_7

*The Notice Procedures*

- <u>Notice of Auction and Sale Hearing</u>. After entry of the Bidding Procedures Order, the Trustee will cause the *Notice of Auction and Sale Hearing*, substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order (the "**Sale Notice**"), to be served by first-class mail, postage prepaid, facsimile, electronic transmission, hand delivery, or overnight mail upon: (i) all entities contacted by or known by the Trustee to have expressed an interest in a transaction with respect to the Clipper Assets during the past six (6) months, including all Qualified Bidders; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all insurers; (iv) all non-debtor parties to relevant contracts or leases (executory or otherwise); (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Clipper Assets; and (vi) upon all parties set forth in the Debtor's Master Service List (to the extent any party to receive notice thereby has not received notice pursuant to sections (i) through (v) above).

- <u>Publication Notice</u>.  In addition to serving the *Notice of Auction and Sale Hearing* described above, the Trustee will also publish an abbreviated version of the Sale Notice in (a) the Houston Chronicle and (b) the New Orleans Times-Picayune.

- <u>Assumption and Assignment Notice</u>.  Prior to the Sale Hearing (defined below), the Trustee will serve the *Assumption and Assignment Notice*, substantially in the form attached as **Exhibit 3** to the Bidding Procedures Order (the "**Assumption and Assignment Notice**"), by first class mail, postage prepaid, facsimile, electronic transmission, hand delivery, or overnight mail on (a) each counterparty under each potential Assumed and Assigned Contract (as defined below) (a "**Contract Counterparty**") and (b) its attorney, if known, in each case, at the last known address available to the Trustee.  The Assumption and Assignment Notice shall set forth the following information: (i) the Contract(s) and/or Lease(s) that may be assumed by the Trustee and assigned to the Successful Bidder(s); (ii) the name and address of the Contract Counterparty thereto; (iii) notice of the proposed effective date of the assignment (subject to the right of the Trustee (in consultation with counsel to the Prepetition Agent (acting at the direction of the Required Lenders)) and Purchaser to withdraw such request for assumption and assignment of the Assumed and Assigned Contract(s) prior to the Closing); (iv)  the amount, if any, determined by the Trustee (in consultation with counsel to the Prepetition Agent) to be necessary to be paid to cure any existing default in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "**Cure Amount**"); and (v) the deadlines by which any such Contract Counterparty must file an objection to the proposed assumption and assignment of any Assumed and Assigned Contract, *provided*, *however*,

that the presence of any Contract or Lease on an Assumption and Assignment Notice does not constitute an admission that such Contract or Lease is an executory contract or unexpired lease. Within 48 hours, or as soon as practicable after the conclusion of the Auction, the Trustee shall file with the Court and serve by facsimile, electronic transmission, hand delivery, or overnight mail on the Contract Counterparty (and its attorney, if known) to each Assumed and Assigned Contract a notice: (a) identifying the Successful Bidder(s); (b) stating which Contract(s) and/or Lease(s) will be assumed and assigned thereto; and (c) containing a statement as to the Successful Bidder(s)' ability to perform the Debtor's obligations under the applicable Assumed and Assigned Contracts.

*The Auction*

• Auction. In the event that the Trustee timely receives one or more additional Qualified Bids, then the Trustee will conduct an auction with respect to the Sale of the Clipper Assets (the "**Auction**"), currently proposed to start on **July 31, 2017 at 10:00 a.m. (CST)** at the offices of Hughes Watters Askanase, LLP, Total Plaza, 1201 Louisiana Street, 28th Floor, Houston, Texas 77002. In order to participate in the Auction, each prospective purchaser must be a Qualified Bidder. Each Qualified Bidder must have at least one individual representative with authority to bind the Qualified Bidder attend the Auction in person. Only Qualified Bidders and their legal and financial advisors shall be entitled to attend and/or bid at the Auction; *provided*, *however*, that the legal and financial representatives of the any Prepetition Secured Party may attend, be heard, and otherwise fully participate at the Auction. By attending the Auction, each party present at the Auction agrees to keep the Auction, the Bids at the Auction, and all details concerning the Auction confidential. The Auction shall be conducted in the presence of a certified court reporter who shall transcribe the Auction.

If Murphy excludes a particular Clipper Asset from the Stalking Horse Agreement, bidding on such Clipper Asset(s) shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction. For all Clipper Assets covered by Murphy's Stalking Horse Agreement, a Qualified Bidder wishing to submit a higher bid at the Auction must bid an amount equal to or greater than the total consideration contained in the Stalking Horse Bid plus the amount of the Breakup Fee (defined below) (the "**Minimum Overbid**").

Subject to the Minimum Overbid, Qualified Bidders shall submit successive bids in increments to be determined by the Trustee (in consultation with counsel to the Prepetition Agent (acting at the direction of the Required Lenders)) at the Auction (the "**Incremental Bid Amount**") for the purchase of the Clipper Assets for which it is bidding on until there is only one offer that Trustee determines, subject to

14

Bankruptcy Court approval and Required Lender consent, is the highest and/or best offer for such assets (a "**Successful Bid**" and such Bidder, the "**Successful Bidder**"), at which point the Auction will be closed.  The second highest bid shall be deemed to be the backup bid (the "**Backup Successful Bid**" and such Bidder, the "**Backup Successful Bidder**"), *provided, however*, that no Prepetition Secured Party shall be required to serve as the Backup Successful Bidder in connection with a credit bid.  In the event that any Prepetition Secured Party makes a determination not to serve as the Backup Successful Bidder (whether before or after submitting any credit bid or other bid), such Prepetition Secured Party shall provide notice to the Trustee and her counsel no later than two (2) business days after the Auction and such third highest bidder shall be deemed to be the Backup Successful Bidder.

When bidding at the Auction, Murphy shall receive a "credit" in the amount of the Breakup Fee (defined below) set forth in the Stalking Horse Agreement.

All Bids made at the Auction shall remain open until the earlier of (i) if the Bidder submits a Successful Bid or is deemed to be the Backup Successful Bidder, forty-five (45) days after the entry of an order by the Court approving a definitive agreement providing for the Sale of those Clipper Assets to which it relates and (ii) if the Qualified Bidder is not selected as a Successful Bidder or the Backup Successful Bidder, four (4) days after the end of the Auction with respect to the relevant Clipper Assets it has bid on.  The Trustee shall have the right with the consent (not to be unreasonably withheld) of the Prepetition Agent (acting at the direction of the Required Lenders), to choose the order in which the Clipper Assets are put up for Auction.

•   Highest and/or Best Bid.  At all times during the Proposed Sale Process, the Trustee (in consultation with counsel to the Prepetition Agent) shall retain full discretion and right to determine which Bid or Bids constitutes the highest or otherwise best offer for the purchase of the Clipper Assets and which bid or bids should be selected as the Successful Bid(s), if any, all subject to final approval by the Bankruptcy Court pursuant to the provisions of section 363(b) of the Bankruptcy Code and Required Lender consent.  The Trustee, with the consent (not to be unreasonably withheld) of the Prepetition Agent, may adopt rules for the Auction that, in her judgment, will better promote the goals of the Auction and that are not inconsistent in any material respect with any of the other material provisions hereof or of any Bankruptcy Court order.

•   Proceeds.  The Prepetition Liens of the Prepetition Secured Parties (as those terms are defined in the Cash Collateral Order) of the Prepetition Lenders and the Adequate Protection Liens (as that term is defined in the Cash Collateral Order) granted to the Prepetition Secured Parties shall

attach to the proceeds of the Sale of the Clipper Assets and the cash proceeds of the Sale (net of transaction costs) shall be applied according to the terms of the Cash Collateral Order; *provided* that the Breakup Fee shall be payable to the Purchaser in accordance with the Stalking Horse Agreement upon consummation of an Alternative Transaction (as defined in the Stalking Horse Agreement). Subsequent to the closing of the sale of any of the Clipper Assets, the Trustee shall promptly file a notice of the receipt and application of all proceeds referred to in this paragraph.

- <u>Reservation of Rights</u>. The Trustee, with the consent (not to be unreasonably withheld) of the Prepetition Agent, reserves the right to modify these Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth herein with respect to any or all Potential Bidders and Bidders, imposing additional terms and conditions with respect to any or all Potential Bidders and Bidders, adjourning or cancelling the Auction at or prior to the Auction and/or adjourning the Sale Hearing (defined below).

*The Breakup Fee*

- <u>Breakup Fee</u>. Upon the consummation of a Sale of the Clipper Assets identified in Murphy's Stalking Horse Agreement, to any single party or combination of parties other than Murphy, the Trustee shall be permitted to pay to Murphy, solely from the Good Faith Deposit of the Successful Bidder, in cash or other immediately available funds an amount of $125,000.00 as set forth in the Stalking Horse Agreement as a Breakup Fee (defined below). *Provided*, *however*, should the Successful Bid on the Clipper Assets identified in Murphy's Stalking Horse Agreement be a credit bid by a Prepetition Secured Party, such Prepetition Secured Party shall satisfy the Stalking Horse Bidder's Breakup Fee.

*The Sale Hearing*

- <u>Sale Hearing</u>. The Trustee intends to present the Successful Bid(s) for approval by the Bankruptcy Court pursuant to the provisions of sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code at the final hearing to approve the Motion (the "**Sale Hearing**") to be scheduled by the Bankruptcy Court and currently proposed to be held on **August 1, 2017 at __:__ _.m. (CST).** The Trustee shall be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing. Upon the failure to consummate a Sale of the Clipper Assets after the Sale Hearing because of the occurrence of a breach or default by the proposed purchaser under the terms of the Successful Bid, the Backup Successful Bid shall be deemed the Successful Bid without further order of the Bankruptcy Court and the parties shall be authorized to consummate the transaction contemplated by the Backup Successful Bid.

3009126_7

- Sale Implementation.  Following the approval of the Successful Bid(s) at the Sale Hearing, the Trustee will be authorized to take any and all actions necessary and appropriate to complete and implement the Sale(s) contemplated by the Successful Bid(s), including, without limitation, seeking entry of one or more orders approving such Sale(s).

## V.  REQUESTED RELIEF

### A.  SUMMARY OF RELIEF REQUESTED

24.     Through this Motion, the Trustee requests the entry of two orders concerning the sale(s) of the Clipper Assets.  First, to provide for the orderly sale of the Clipper Assets, the Trustee seeks the immediate entry of the Bidding Procedures Order approving the Bidding Procedures summarized above.  This relief requested by the Trustee is intended to provide for a competitive bidding and auction procedure for the Clipper Assets to maximize value for the Estate, its creditors, and other stakeholders as expeditiously as possible, especially in light of the milestones approved by the Court in connection with the Cash Collateral Order.

25.     Following the entry of the Bidding Procedures Order, the Trustee will solicit Bids according to the Bidding Procedures in hopes of receiving acceptable offers for the Clipper Assets.  In the event more than one Qualified Bid is received prior to the Bid Deadline, the Trustee will hold an Auction at which she (in consultation with counsel to the Prepetition Agent (acting at the direction of the Required Lenders)) will choose the Successful Bidder(s) with the highest and best Bid(s) for the Clipper Assets.  As the Clipper Assets that Murphy elects to exclude from the Stalking Horse Agreement may be sold in whole or in blocks, there may be more than one Successful Bidder for the Clipper Assets but only one Successful Bidder for any particular Clipper Asset.

### B.  THE SALE ORDER

26.     Following the Bid Deadline and after the Auction, if any, the Trustee will  request the entry of an order substantially in the form attached hereto as **Exhibit "C"** (the "**Proposed**

**Sale Order**") (a) approving the Sale or Sales of the Clipper Assets free and clear of (i) all liens, claims, charges, and encumbrances (as more specifically defined in the Form Purchase Agreement or as modified in the final purchase agreement between the Trustee and the Successful Bidder(s)) relating to, accruing, or arising any time prior to the Closing Date, including, without limitation, any such liens (x) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase, or repurchase right or option, or termination of, the Debtor or the Purchaser's interests in the Purchased Assets (as such terms are defined in the Proposed Sale Order), or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (with such liens attaching to the proceeds of the sale or sales) and (ii) all debts arising under, relating to, or in connection with any act of the Debtors, the Trustee, and/or the Estate or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this Case, and whether imposed by agreement, understanding, law, equity, or otherwise relating to, accruing or arising any time prior to the Closing Date (collectively in this clause (ii), the "**Claims**" and together with the liens, the "**Claims and Interests**"), with the exception of any Assumed Encumbrances (as that term is defined in the Form Purchase Agreement or as modified in the final purchase agreement between the Trustee and the Successful Bidder) to the Successful Bidder(s) and (b) authorizing the Trustee to assume and assign the contracts and leases to be assumed and assigned to the Successful Bidder(s) (the "**Assumed and Assigned Contracts**").

## C.  THE BIDDING PROCEDURES ORDER

27.      The Trustee desires to receive the greatest value possible for the Clipper Assets.
The Bidding Procedures were developed so as to be consistent with the Trustee's need to
expedite the sale process but with the object of promoting active bidding that will result in the
highest and best offer (or offers) possible.  In addition, these procedures reflect the Trustee's
objective of conducting an Auction in a controlled, but fair and open, manner that promotes
interest in the Clipper Assets by financially and operationally capable, motivated bidders who are
likely to close a transaction, while simultaneously discouraging offers from persons the Trustee
does not believe are sufficiently capable or likely to actually consummate a transaction.

28.      In the event that additional Qualified Bids are received, the Trustee requests that
the Auction of the Clipper Assets be held on **July 31, 2017 at 10:00 a.m. (CST)** at the offices of
Hughes Waters Askanase LLP, Total Plaza, 1201 Louisiana Street, 28th Floor, Houston, Texas
77002, or such other location determined by the Trustee, at which Auction the Trustee (in
consultation with counsel to the Prepetition Agent) may select the Successful Bid for any
particular Clipper Asset in accordance with the Bidding Procedures.  **ALL SALE(S) SHALL
BE SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT AND
REQUIRED LENDER CONSENT.**

29.      On or prior to three (3) days after the Bid Deadline, the Trustee will file a list of
the Qualified Bidders on the Case docket.

30.      The Stalking Horse Bidder(s), parties who submit Qualified Bids prior to the Bid
Deadline, the Prepetition Secured Parties, the Trustee and the professionals of the foregoing shall
be entitled to attend, be heard, and otherwise fully participate at the Auction.  Each Qualified
Bidder must have at least one individual representative with authority to bind the Qualified
Bidder attend the Auction in person.  By attending the Auction, each party present at the Auction

agrees to keep the Auction, the Bids at the Auction, and all details concerning the Auction confidential.  The Auction will be conducted in accordance with the Bidding Procedures.

31.     In the event that the Trustee has conducted an Auction or otherwise selected a Successful Bid(s) in connection with the Bidding Procedures described above, the Trustee requests that the Sale Hearing be conducted by the Bankruptcy Court on **August 1, 2017 at**   **__:__ .m. (CST)** or at such other time as the Bankruptcy Court permits.

32.     Subject to Bankruptcy Court approval following the Auction, the Successful Bidder(s) shall purchase the Clipper Assets, free and clear of all Claims and Interests, pursuant to the Motion and the corresponding order of the Bankruptcy Court approving the Motion (those persons having so purchased some or all of the Clipper Assets, the "**Purchaser**").

33.     If a Bidder is the Successful Bidder with respect to any of the Clipper Assets at the end of the Auction, the Trustee shall file a notice of the relevant Successful Bidder(s) on the Case docket.

34.     Any sale of the Clipper Assets shall be without representation or warranties of any kind, nature or description by the Trustee, her agents, or the Estate, except as expressly provided in the purchase agreement between the Trustee and the Purchaser. All of the Clipper Assets shall be transferred "as is," "where is" and "with all faults." **EXCEPT AS PROVIDED IN THE STALKING HORSE AGREEMENT, THE TRUSTEE EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE, OR CONDITION OF ANY ASSET.**

35.     Following the Sale Hearing, if any Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of the Successful Bidder, the

3009126_7

Clipper Assets shall be sold to the Backup Successful Bidder.  In such case, the Successful Bidder's Good Faith Deposit shall be forfeited to the Trustee in the manner provided in the applicable asset purchase agreement, and the Trustee specifically reserves the right to seek all available damages from the defaulting Successful Bidder or Backup Successful Bidder (if such party shall also breach or fail to perform), as applicable.

**D.  BREAKUP FEE**

36.     In recognition of the expenditure of time, energy, and resources and the benefit to the Estate of being a Stalking Horse Bidder, the Trustee is requesting the authority to pay the Stalking Horse Bidder (*i.e.* Murphy) $125,000.00, solely from the Good Faith Deposit of the Successful Bidder, as a breakup fee (the "**Breakup Fee**") in the event that the Clipper Assets identified in Murphy's Stalking Horse Agreement are sold to any party other than Murphy. *Provided, however*, should the Successful Bid for such Clipper Assets be a credit bid of a Prepetition Secured Party, such Prepetition Secured Party shall satisfy Murphy's Breakup Fee.

37.     The Breakup Fee was a material inducement for, and a condition of, the Stalking Horse Bidder's entry into the Stalking Horse Agreement.  The Trustee believes that the Breakup Fee is fair and reasonable in view of, among other things, (a) the intensive analysis, due diligence investigation and negotiations the Stalking Horse Bidder has undertaken in connection with the Sale and (b) the fact that the efforts of the Stalking Horse Bidder will have increased the chances that the Trustee will receive the highest and best offer for the Clipper Assets by establishing a minimum bid for other bidders, attracting other bidders to the Auction, and serving as a catalyst for other potential or actual bidders, all for the benefit of the Estate, its creditors, and all other parties-in-interest.  Thus, the Trustee requests that the Bankruptcy Court approve and authorize payment of the Breakup Fee by entry of the Bidding Procedures Order.

### E.  ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS

38.     In addition, to facilitate the sale, assumption, and assignment of the leases and contracts, the Trustee proposes to serve the Assumption and Assignment Notice as soon as practicable after the entry of the Bidding Procedures Order and requests that the Bankruptcy Court approve the following procedures for fixing any cure amounts owed on the leases and contracts (the "**Assumption and Assignment Procedures**").

39.     All objections to the assumption and assignment of any lease or contract, including without limitation any objection to the Trustee's proposed Cure Amount or the provision of adequate assurance of future performance under any lease or contract pursuant to section 365 of the Bankruptcy Code ("**Adequate Assurance**"), must: (a) comply with the General Objection Procedures (as defined below); (b) identify the lease or contract to which the objector is party; (c) describe with particularity any cure the claimant contends is required under section 365 of the Bankruptcy Code (the "**Cure Claim**") and identify the basis(es) of the alleged Cure Claim under the contract or lease; (d) attach all documents supporting or evidencing the Cure Claim; and (e) if the response contains an objection to Adequate Assurance, state with specificity what the objecting party believes is required to provide Adequate Assurance (collectively with the General Objection Procedures, the "**Assigned Contract Objection Procedures**").

40.     If no objection is timely and properly filed and served in accordance with the Assigned Contract Objection Procedures, (a) the Cure Amount set forth in the Assumption and Assignment Notice shall be controlling notwithstanding anything to the contrary in any contract or lease or other document and the non-debtor party to the contract or lease shall be forever barred from asserting any other claim arising prior to the assignment against the Trustee, the Estate, or Purchaser as to such contract or lease if it is an Assumed and Assigned Contract and

(b) the Purchaser's promise to perform under the contract or lease shall be deemed Adequate Assurance under the contract or lease. To the extent the Trustee (or Purchaser) disputes any Cure Claim, such dispute shall be presented to the Bankruptcy Court at the Sale Hearing, or such earlier or later date and time as the Trustee and the objector may agree or the Bankruptcy Court may order, but such dispute shall not affect in any way the effectiveness of any assumption and assignment of a contract or lease. All Cure Amounts shall be paid by the Purchaser and in addition to the purchase price paid for the Clipper Assets.

41. While the Trustee has made a good faith effort to identify all contracts and leases to be assumed and assigned in connection with the Sale(s), she may discover additional contracts and/or leases that the Trustee and the Purchaser desire to assume and assign in connection therewith. Accordingly, if at any time after the entry of the Bidding Procedures Order the Trustee (in consultation with counsel to the Prepetition Agent) identifies additional prepetition executory contracts and/or leases to be assumed and assigned to the Purchaser as Assumed and Assigned Contracts (whether before or after closing of any Sale(s) of relevant Clipper Assets), the Trustee shall serve a supplemental Assumption and Assignment Notice by facsimile, electronic transmission, hand delivery, or overnight mail on the Contract Counterparty (and its attorney, if known) to each supplemental Assumed and Assigned Contract at the last known address available to the Trustee by no later than seven (7) days before the proposed effective date of the assignment. Each supplemental Assumption and Assignment Notice shall set forth the following information: (i) the name and address of the Contract Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the Trustee (in consultation with counsel to the Prepetition Agent) and Purchaser to withdraw such request for assumption

and assignment of the Assumed and Assigned Contract prior to the Closing), (iii) identification of the Assumed and Assigned Contract, and (iv) the Cure Amount, if any.

42.     Unless the Contract Counterparty or any other entity properly files an objection to the supplemental Assumption and Assignment Notice in accordance with the General Objection Procedures (as defined below) within seven (7) days of the date of the supplemental Assumption and Assignment Notice, the Trustee may assume and assign the Assumed and Assigned Contract, subject to the occurrence of the Closing, without further order or notice of hearing (other than to the Prepetition Agent).  If an objection is filed and served in accordance with the General Objection Procedures within seven (7) days of the date of the supplemental Assumption and Assignment Notice, and the objection cannot be resolved consensually, then the Trustee shall request the Bankruptcy Court set a hearing to consider the objection as soon as its calendar will allow.

**F.  NOTICE**

43.     The Trustee proposes to give notice, immediately after the entry of the Bidding Procedures Order, of the Bidding Procedures, the Form Purchase Agreement, the Stalking Horse Agreement(s), as applicable,[5] the Assumption and Assignment Notice, the time and place of the Auction, the Sale Hearing, and the Objection Deadline.  The Trustee further proposes to give notice of the Sale Hearing and the Objection Deadline by sending the Sale Notice to: (i) all entities contacted by the Trustee and/or her counsel or known by the Trustee to have expressed an interest in a transaction with respect to the Clipper Assets during the past six (6) months, including all Qualified Bidders; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all insurers; (iv) all non-

---

[5]  If the Trustee selects an additional Stalking Horse Bidder(s), she will distribute to all known potential bidders a copy of the additional Stalking Horse Agreement(s) at least one (1) day prior to the Bid Deadline.

debtor parties to relevant contracts or leases (executory or otherwise); (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Clipper Assets; and (vi) upon all parties set forth in the Debtor's Master Service List (to the extent any party to receive notice thereby has not received notice pursuant to sections (i) through (v) above).

### G. OBJECTIONS

44.     All objections to the Sale of the Clipper Assets, the assumption and assignment of the Assumed and Assigned Contracts, or any relief requested in the Motion other than the relief granted by the Bankruptcy Court in the Bidding Procedures Order must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Bankruptcy Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 515 Rusk Avenue, Houston, Texas 77002 by no later than **3:00 p.m. (CST) on July 26, 2017** (the "**General Objection Deadline**"), or other applicable deadline as indicated in this Motion, *provided, however*, that any party may object based on events occurring at the Auction until 4:00 p.m. (CST) on the day prior to the Sale Hearing; and (e) served in accordance with the Local Bankruptcy Rules so as to be received on or before the relevant objection deadline by the following (collectively, the "**Objection Notice Parties**"): on (i) counsel for the Trustee: Hughes Watters Askanase LLP, Total Plaza, 1201 Louisiana Street, 28th Floor, Houston, Texas 77002, Attn: Timothy A. Million (tmillion@hwa.com) and Randall A. Rios (rrios@hwa.com); (ii) counsel for the Prepetition Agent: O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, New York 10036, Attn: Michael F. Lotito (mlotito@omm.com); (iii) the Office of the United States Trustee for the Southern District of Texas: 515 Rusk Avenue, Suite 3516, Houston, Texas 77002, Attn: Hector Duran (Hector.Duran.Jr@usdoj.gov); and (iv) United States Attorney's Office for the Southern District of Texas: 1000 Louisiana Street, Suite 2300,

Houston, Texas  77002, Attn: Eunice Hudson (Eunice.R.Hudson@jsdoj.gov) and Rick Kincheloe

(Richard.Kincheloe@usdoj.gov) (these procedures are collectively referred to as the "**General**

**Objection Procedures**").  Each objection shall state the legal and factual basis of such objection

and may be orally supplemented at the relevant hearing.

## VI.  <u>ARGUMENTS AND AUTHORTIES</u>

### A.  THE BIDDING PROCEDURES ARE APPROPRIATE UNDER THE CIRCUMSTANCES

45.     A trustee may sell, after notice and a hearing, estate assets outside the ordinary

course of business.  *See* 11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of

assets, a trustee must demonstrate, among other things, that the "proffered purchase price is the

highest and best offer" under the circumstances of the case.  *See e.g., Four B. Corp. v. Food*

*Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding

that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate

at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established

principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the

highest price or greatest overall benefit possible for the estate.") (*quoting Cello Bay Co. v.*

*Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga.

1988)).

46.     The implementation of competitive bidding procedures to facilitate the sale of a

debtor's assets outside of the ordinary course business is routinely approved by bankruptcy

courts as a means of ensuring that such sale will generate the highest and best return for a

debtor's estate. The Trustee submits that the foregoing bidding procedures and the opportunity

for competitive bidding embodied therein are reasonable and designed to maximize the value of

the Clipper Assets and should, therefore, be approved by the Bankruptcy Court.

47.     Given the Trustee's current liquidity constraints and her obligations under the Cash Collateral Order, the Trustee believes that a prompt sale process is the best way to maximize the value of the Clipper Assets for the benefit of the Estate, its creditors, and other stakeholders.  The Trustee cannot sustain an extended postpetition sale period due to the Estate's limited cash resources, the milestones established pursuant to the Cash Collateral Order, and the limited patience of the applicable regulatory agencies of the United States to allow the Debtors' leases to be maintained absent production in paying quantities.  The Trustee believes that the value of the Clipper Assets and, therefore, the consummation of the Sale(s) will be seriously jeopardized unless she can begin the sale process contemplated herein as expeditiously as possible.

48.     Accordingly, in the exercise of her reasonable business judgment, the Trustee has concluded that (a) a prompt sale of the Clipper Assets is the best way to maximize value for the Estate and (b) the proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for the Clipper Assets.

## B.  THE BREAKUP FEE SHOULD BE APPROVED

49.     The Trustee has formulated a bidding process that she believes will induce prospective competing bidders to expend the time, energy, and resources necessary to submit a Qualified Bid, and which the Trustee believes is fair and reasonable in view of the assets to be sold.  The Proposed Sale Process and, in particular, the proposed Breakup Fee, is reasonable and supported by applicable case law.

50.     The use of breakup fees has become an established practice in bankruptcy asset sales involving the sale of significant assets because such breakup fees enable a trustee to ensure a sale to a contractually committed bidder at a price the trustee believes is fair, while providing the trustee with the potential of obtaining an enhanced recovery through an auction process.

27

Historically, bankruptcy courts have approved bidding incentives similar to the Breakup Fee solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a trustee taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.,* Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at \*5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"). *See also In re Integrated Resources*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

51.    The Breakup Fee is consistent with the "business judgment rule". The Stalking Horse Bidder likely would not have entered into the Stalking Horse Agreement without this bargained for protection. Once the Bidding Procedures are approved by the Bankruptcy Court, the Trustee will provide potential purchasers with the Form Purchase Agreement and they will be afforded an opportunity to submit an asset purchase agreement marked to show changes necessary to consummate a sale which must be acceptable to the Trustee. The proposed Breakup Fee is reasonable and consistent with the range of bidding protections typically approved by bankruptcy courts in this district. *See, e.g., In re Deep Marine Holdings*, Case No. 09-39313 (Bankr. S.D. Tex. April 12, 2010) (Isgur, J.) (approving break up fee of 3% of the proposed purchase price and additional expense reimbursement of $150,000).

52.    Further, the Breakup Fee will encourage competitive bidding. The Breakup Fee will likely induce bids that might not otherwise been made and serve to prevent bidding from being limited. Similarly, the Stalking Horse Bidder's offer will serve as a minimum or floor bid

28

upon which other bidders will rely to be minimally acceptable to the Required Lenders, thereby increasing the likelihood that the highest and best price(s) will be obtained for the Clipper Assets.  Finally, the existence of the Breakup Fee will permit the Trustee to insist that competing bids for the Debtor's assets be materially higher or otherwise better than that offered by a Stalking Horse Bidder, a clear benefit to the Estate and its creditors.

53.     Therefore, because the procedures and incentives included in the Sale(s), including the proposed Breakup Fee, are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Clipper Assets and thereby confer actual benefits upon the Estate, and are within the range of incentives customarily approved by courts, such procedures should be approved in this Case.

## C. THE SALE OF THE CLIPPER ASSETS IS A PRODUCT OF THE TRUSTEE'S REASONABLE BUSINESS JUDGMENT

54.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

55.     The Fifth Circuit Court of Appeals has explained that section 363 incorporates a business judgment standard that is to be utilized by the courts when considering a proposed sale of estate property outside of the ordinary course of business.  *ASARCO, L.L.C. v. Elliott Mgmt.* (*In re ASARCO, L.L.C.*), 650 F.3d 593, 601 (5th  Cir. 2011).  When seeking approval of a sale under section 363 of the Bankruptcy Code, "'for the debtor-in-possession or trustee to satisfy its fiduciary duties to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing property outside the ordinary course of

business.'" *Id.* (*quoting In re Cont'l Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (*quoting* 11 U.S.C. § 363(b)(1) and *citing In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (holding that the approval of a proposed 363 sale "must be supported by an articulated business justification, good business judgment, or sound business reasons.")).

56.     The ASARCO Court further explained that "[t]he business judgment standard in section 363 is flexible and encourages discretion." *In re ASARCO*, 650 F.3d at 601. "'Whether the proffered business justification is sufficient depends on the case . . . . [T]he bankruptcy judge 'should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.'"  *Id.* (*quoting Cont'l Airlines*, 780 F.2d at 1226 (*quoting In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983))).

57.     Virtually all courts have held that approval of a proposed sale of the assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business (even prior to the confirmation of a plan of reorganization in chapter 11 cases) is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. *See In re Abbotts Dairies of Pa.,* 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [*sic*] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value."); *In re Stroud Ford, Inc.,* 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re*

*Industrial Valley Refrigeration & Air Conditioning Supplies Inc.,* 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

58.      The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee has obtained a fair and reasonable price; and (4) good faith.  *In re Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel Corp.,* 82 B.R. at 335-36; *see also Stephens Indus.*, 789 F.2d at 390; *In re Lionel Corp.,* 722 F.2d at 1071.

59.      Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a debtor outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the bankruptcy estate, its creditors, or interest holders. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 143; *In re Lionel Corp.*, 722 F.2d at 1063 (passim); *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir. 1974) ("Other circuits have recognized the power of the bankruptcy court under Chapter X to authorize a sale of the Debtors' property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets").

31

60.     The proposed procedures for the Sale(s) of the Estate's assets meet the "sound business reason" test.  First, sound business purposes justify the Sale(s).  The Trustee believes that a prompt sale of the Clipper Assets by auction presents the best opportunity to realize the maximum value of the Estate's assets for distribution to creditors and is required under the terms of the Cash Collateral Order.  The Trustee further believes that the net benefit to the Estate's creditors may be adversely affected absent an immediate sale, as a result of the Trustee's inability to continue to fund the administration of the Estate and the possibility of the most valuable assets of the Estate (*i.e.*, the oil and gas leases) being terminated by the United States. *See In re Lionel Corp.,* 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").  Indeed, the Clipper Assets include oil and gas leases that are subject to termination whose prompt sale is entirely justified under the circumstances.

61.     The proposed procedures for the sale of the Clipper Assets also meet the other factors of the "sound business reason" test.  As part of this Motion, the Trustee has sought to establish procedures for notice to creditors, other prospective bidders, and other parties-in-interest.  Under the circumstances of this Case, the Trustee submits that the notice period proposed satisfies the requirements of the Bankruptcy Rules, including Rule 2002, and provides sufficient time for parties-in-interest to submit objections to the proposed sale(s) and for bidders to formulate and submit competing proposals.

62.     Finally, the Trustee submits that the results of the Auction will be the product of good faith, arm's length negotiations with respect to the price and other terms of the sale of the Clipper Assets between the Trustee and highest and best bidder(s) at the conclusion of the Auction.

3009126_7

63.     As set forth above, the Trustee has determined, in the exercise of her sound business judgment, that the sale of the Clipper Assets to the highest and best bidder at the Auction is appropriate and in the best interests of the Estate, its creditors, and parties-in-interest. The sale of the Clipper Assets at the Auction will afford the Trustee an opportunity to maximize the recoveries to creditors.  Accordingly, the Trustee requests that the Bankruptcy Court approve the proposed procedures for the sale of the Clipper Assets to the highest or otherwise best bidder(s) at the Auction and approve the Sale(s) presented to the Bankruptcy Court at the Sale Hearing.

**D.  THE STALKING HORSE BIDDER OR SUCCESSFUL BIDDERS SHOULD BE GRANTED THE PROTECTIONS OF BANKRUPTCY CODE SECTION 363(m)**

64.     As will be explained in further detail at the Sale Hearing, the Trustee also maintains that a Stalking Horse Bidder or Successful Bidder is and will be entitled to the protections afforded by section 363(m) of the Bankruptcy Code.

65.     Specifically, section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

66.     While the Bankruptcy Code does not define "good faith," "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted); *see generally Marin v.*

*Coated Sales, Inc., (In re Coated Sales, Inc.)*, Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (*quoting In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))).

67.     The Trustee has spent a considerable amount of time and resources negotiating the Stalking Horse Agreement at arm's length, with give and take on both sides.  Similarly, as the Trustee will demonstrate at the Sale Hearing, any Successful Bidder shall have also negotiated and dealt with the Trustee at arm's length.   Under these circumstances, the Bankruptcy Court should find in the order(s) approving the Sale(s) of the Clipper Assets that such Stalking Horse Bidder or Successful Bidder, as applicable, is entitled to all of the protections of section 363(m) of the Bankruptcy Code.

**E.   THE STALKING HORSE AGREEMENT OR ASSET PURCHASE AGREEMENT OF A SUCCESSFUL BIDDER IS NOT THE SUBJECT OF COLLUSIVE BIDDING UNDER BANKRUPTCY CODE SECTION 363(n)**

68.     As set forth above, the Trustee will select a Stalking Horse Bidder or Successful Bidder at arm's length and in good faith regarding the sale of the Clipper Assets.  Moreover, the Trustee does not believe that any such sale will be the result of collusion or other bad faith between bidders or that the sale price under the Stalking Horse Agreement or asset purchase agreement of a Successful Bidder has been or will be controlled by an agreement between potential or actual bidders within the meaning section 363(n) of the Bankruptcy Code.

69.     As the Trustee will demonstrate at the Sale Hearing, (i) the Stalking Horse Agreement was negotiated, proposed, and entered into by the Trustee and the Stalking Horse

34

Bidder without collusion, in good faith, and from arm's-length bargaining positions or (ii) that the asset purchase agreement of a Successful Bidder will have been negotiated, proposed, and entered into by the Trustee and such Successful Bidder without collusion, in good faith, and from arm's-length bargaining positions.   Neither the Trustee nor the Stalking Horse Bidder or Successful Bidder(s) will have engaged in any conduct that would cause or permit a Stalking Horse Agreement or asset purchase agreement of a Successful Bidder, as applicable, to be avoided under section 363(n) of the Bankruptcy Code.

**F.   SALE OF THE CLIPPER ASSETS DOES NOT REQUIRE THE APPOINTMENT OF A CONSUMER PRIVACY OMBUDSMAN**

70.     Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer customer list containing personal information relating to individual persons is inconsistent with the Debtor's consumer privacy policy, section 332 governs the appointment of a consumer privacy ombudsman.  11 U.S.C. § 363(b)(1).  Here, none of the Debtor's customers that are subject to the sale of the Clipper Assets are individuals, and the Debtor does not have a consumer privacy policy, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

**G.  SALE OF THE CLIPPER ASSETS SHOULD BE FREE AND CLEAR OF CLAIMS AND INTERESTS**

71.     Pursuant to section 363(f) of the Bankruptcy Code, the Trustee seeks authority to sell and transfer the Clipper Assets to all Purchasers free and clear of all Claims and Interests, with such Claims and Interests to attach to the proceeds of the sale of the Clipper Assets, subject to any rights and defenses of the Trustee and other parties-in-interest with respect thereto. Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  *See also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) is written in the disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

72.    A sale free and clear of all Claims and Interests is necessary to maximize the value of the Clipper Assets.  A sale subject to Claims and Interests would result in a lower purchase price and be of substantially less benefit to the Estate.  A sale free and clear of Liens is particularly appropriate under the circumstances because any Lien in, to or against the Clipper Assets that exists immediately prior to the closing of any sale(s) will attach to the sale proceeds with the same validity, priority, force, and effect as it had at such time, subject to the rights and defenses of the Trustee or any party-in-interest.  The Trustee submits that holders of Liens will be adequately protected by the availability of the proceeds of the Sale(s) to satisfy their Liens.  Thus, the proposed sale satisfies section 363(f) of the Bankruptcy Code.  Moreover, any holder of a Claim or Interest that receives notice of the sale and which fails to object to the sale of the Clipper Assets free and clear of Claims and Interests should be deemed to consent to the sale, thereby complying with section 363(f)(2) of the Bankruptcy Code.

## H.  NOTICE OF THE PROPOSED SALE IS REASONABLE UNDER THE CIRCUMSTANCES

73.    In order to receive the highest and best price in return for the Clipper Assets under the circumstances, the Trustee has filed this Motion seeking to conduct the Auction and hold the

Sale Hearing on an accelerated track.  The Trustee continues to incur costs associated with preserving the value of the Clipper Assets.  In order to yield the greatest possible return for the benefit of creditors and to cut off potential administrative expenses, the Trustee believes that an expedited auction and sale process is warranted and necessary in light of the terms of the Cash Collateral Order.  Accordingly, the Trustee submits that the notice to be provided is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Clipper Assets, and/or to object to the proposed Sale of the Clipper Assets.

## I. THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES SHOULD BE AUTHORIZED

74.    Under section 365(a) of the Bankruptcy Code, a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an executory contract of a debtor.  This subsection provides:

> (b) (1) If there has been a default in an executor contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if --

3009126_7

(A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

75.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992).

76.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

77.     To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment as set forth in this Motion.  If necessary, the Trustee will submit facts prior to or at the Sale Hearing to show the financial capability of the Purchaser(s) and willingness and ability to perform under the Assumed and Assigned Contracts. The Sale Hearing will therefore provide the Bankruptcy Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser(s) to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

78.     In addition, the Trustee submits that it is an exercise of her sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser(s) in connection with the consummation of the Sale, and the assumption, assignment, and sale of Assumed and Assigned Contracts is in the best interests of the Estate, its creditors, and all parties-in-interest.  The Assumed and Assigned Contracts being assigned to the Purchaser(s) are an integral part of the Clipper Assets being purchased by Purchaser(s), and accordingly, such assumption, assignment, and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Estate.  The Bankruptcy Court should therefore authorize the Trustee to assume and assign the Assumed and Assigned Contracts as set forth herein.

## J.   THE MUTUAL RELEASES CONTAINED IN THE MURPHY STALKING HORSE AGREEMENT SHOULD BE APPROVED IN THE EVENT THAT MURPHY IS THE SUCCESSFUL BIDDER

79.     The Murphy Stalking Horse Agreement contemplates the exchange of mutual releases between the Trustee and the Estate on the one hand and Murphy on the other.  More specifically, Murphy has asserted both pre and post-petition claims against the Estate related to the PHA.  Pre-petition, Bennu asserted certain audit claims against Murphy under the PHA. Both the Trustee and Murphy consider the mutual releases to be a significant consideration for entering into the Stalking Horse Agreement.  For the reasons the Trustee will demonstrate at the Sale Hearing, should Murphy be the Successful Bidder, those factors utilized by the courts to evaluate the merits of a proposed compromise (*i.e.*, those established in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968); *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir.), *cert. denied*, 469 U.S. 880 (1984); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980)), will be satisfied.  Accordingly, should Murphy be the Successful Bidder, the Court should authorize the Trustee and Estate to exchange mutual releases with Murphy as a part of the sale of the Clipper Assets.

### K. WAIVER OF THE AUTOMATIC FOURTEEN-DAY (14) STAY UNDER BANKRUPTCY RULES 6004(H) AND 6006(D)

80.     Pursuant to Rule 6004(h), unless the Bankruptcy Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  Similarly, under Rule 6006(d), unless the Bankruptcy Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days (14) after entry of the order.  The purpose of Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

81.     Although Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  *See generally* 10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id.*

82.     Because of the potentially diminishing value of the Clipper Assets and consistent with prior orders, the Trustee must close this sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

### VII.  <u>EMERGENCY RELIEF REQUESTED</u>

83.     As explained in the Motion, the Cash Collateral Order established certain milestones by which the Trustee must complete any sale(s) of the Clipper Assets.  Moreover, the

Trustee is faced with the real possibility that some of the most valuable assets of the Estate (*i.e.*, the oil and gas leases) will effectively evaporate as a result of the termination by the United States if the proposed timeline for the marketing and sale of the Clipper Assets is not approved and completed.  Such a result would be detrimental to all parties involved, because termination of the leases cannot be cured and the Trustee would be precluded from selling valuable assets for the benefit of the Estate and its creditors.

84.     Given the rapidly approaching deadlines under the terms of the Cash Collateral Order and the potential loss of valuable Estate assets, the Trustee requests emergency consideration of the Motion as soon as the Court's calendar will allow and in any event no later than **July 14, 2017**.

85.     Notice of this Motion has been given to: (i) all entities contacted by the Trustee and/or her counsel or known by the Trustee to have expressed an interest in a transaction with respect to the Clipper Assets during the past six (6) months, including all Qualified Bidders; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all insurers; (iv) all non-debtor parties to relevant contracts or leases (executory or otherwise); (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Clipper Assets; and (vi) upon all parties set forth in the Debtor's Master Service List  The Trustee submits that no other or further notice is necessary or required under the circumstance.

## VIII.  CONCLUSION

86.     For the reasons set forth above, the Trustee respectfully requests the Bankruptcy Court:

> (1) enter an order substantially in the form of the Bidding Procedures Order attached hereto as **Exhibit B**: (a) authorizing and approving the Bidding

Procedures attached as **Exhibit 1** thereto (to include approving the Breakup Fee); (b) approving the form and manner of the Sale Notice attached as **Exhibit 2** to the Bidding Procedures Order; (c) scheduling the Auction and Sale Hearing; (d) approving the Assumption and Assignment Procedures and the Assumption and Assignment Notice attached as **Exhibit 3** to the Bidding Procedures Order; and (e) granting the Trustee all such other and further relief, both at law and in equity, to which she may justly be entitled; and

(2) at the conclusion of the Sale Hearing, enter an order (or orders) substantially in the form of the Proposed Sale Order attached hereto as **Exhibit C**: (a) approving the Sale of all or substantially all of the Clipper Assets free and clear of all liens, charges, claims, encumbrances, and other interests pursuant to one or more Stalking Horse Agreements and/or Qualified APAs; (b) authorizing the assumption and assignment of any Assumed and Assigned Contracts; and (c) granting the Trustee all such other and further relief, both at law and in equity, to which she may justly be entitled.

**[Remainder of Page Left Intentionally Blank]**

3009126_7

Dated: July 12, 2017.

Respectfully submitted,

HUGHES WATTERS ASKANASE, L.L.P.


By:   *Timothy A. Million*
        Randall A. Rios
        State Bar No. 16935865
        Timothy A. Million
        State Bar No. 24051055
        Total Plaza
        1201 Louisiana St., 28th Floor
        Houston, Texas  77002
        Tel:  713-759-0818
        Fax:  713-759-6834

COUNSEL FOR JANET S. NORTHRUP,
CHAPTER 7 TRUSTEE

3009126_7

## CERTIFICATION FOR ACCURACY PURSUANT TO LBR 9013-1(i)

I hereby certify that the facts and assertions made in the *Trustee's Emergency Motion Seeking the Entry of an Order: (i) Approving Auction and Bidding Procedures, Breakup Fee, and Procedures for the Assumption and Assignment of Executory Contracts; (ii) Approving Notice Procedures for the Solicitation of Bids and an Auction; (iii) Scheduling a Hearing on Approval of the Sale of the Debtor's Clipper Assets Free and Clear of All Liens, Claims, Charges, and Encumbrances, and the Assumption and Assignment of Executory Contracts; and (iv) Granting Related Relief* are true and accurate to the best of my knowledge.

*/s/ Janet S. Northrup*
Janet S. Northrup

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the *Trustee's Emergency Motion Seeking the Entry of an Order: (i) Approving Auction and Bidding Procedures, Breakup Fee, and Procedures for the Assumption and Assignment of Executory Contracts; (ii) Approving Notice Procedures for the Solicitation of Bids and an Auction; (iii) Scheduling a Hearing on Approval of the Sale of the Debtor's Clipper Assets Free and Clear of All Liens, Claims, Charges, and Encumbrances, and the Assumption and Assignment of Executory Contracts; and (iv) Granting Related Relief* was served (i) to the parties on the attached service list receiving electronic notice *via* the courts' ECF noticing system on July 12, 2017 and (ii) to all other parties on the attached service list *via* United States first class mail, postage prepaid, on July 13, 2017.

*/s/ Timothy A. Million*
Timothy A. Million

3009126_7